UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| MUSTAFA HUNDUR, *Petitioner*, | | |
| v. | | No. 1:25-cv-01496-MSN-WBP |
| HAZAL BARUT HUNDUR, *Respondent.* | | |

**MEMORANDUM OPINION**

This matter comes before the Court on Petitioner's Verified Petition for the Return of the Minor Child. ECF 3. *Pro se* Petitioner Mustafa Hundur ("Hundur") initiated these proceedings against Hazal Barut Hundur ("Barut") under the Hague Convention of the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10494–01 (Mar. 26, 1986) (the "Hague Convention"), and its implementing statute, the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 9001–9011, seeking the return of their minor son ("AH") to Turkey from the United States. Upon consideration of the Petition, the parties' briefs, and the evidence presented during an evidentiary hearing, the Court grants the Petition.

I.      **FINDINGS OF FACT**

The parties presented the following evidence during an evidentiary hearing. Hundur and Barut are both Turkish nationals who met in February 2022 at a business meeting. By April 2022, the two began dating.

Although Hundur and Barut lived in Turkey, Hundur had strong connections to the United States. He runs an export company that does business in the United States, and he has friends and

family here. Barut also has family in the United States. As they began their relationship, they discussed moving to the U.S. and saving money for the move. Their relationship, however, quickly hit a bump. Barut felt that Hundur was controlling and "not on the same page," and so the two broke up around July 2022.

After spending a few months apart, Barut and Hundur got back in touch in September 2022. Barut was going through an emotionally difficult time after having an abortion and Hundur offered her support and companionship. They began seeing each other again and, in November 2022, went on a date in Istanbul. Barut testified that, the morning after their date, Hundur initiated sex with her without her consent. Barut told Hundur to stop, but he did not, telling her afterwards that he "knew that [she] wanted it."

A few weeks later, Barut discovered that she was pregnant. She reached out to Hundur in January 2023 to let him know about the pregnancy and the two discussed whether they should keep the baby. Hundur urged her to get another abortion and expressed that he was planning to move to the United States. Barut, however, ultimately decided to keep the baby, and the two began dating again. In June 2023, they moved in together into an apartment in Istanbul. On July 26, 2023, their son, AH, was born.

After AH's birth, Barut and Hundur resumed thinking about moving to the United States. For example, in September 2023, Hundur wrote that he wanted to make the move a "milestone" and do it "in a planned manner." Around the same time, he consulted immigration lawyers to see if there was a way for them to obtain work-based visas and sent Barut information about requirements to travel here. In May 2024, Hundur messaged Barut's mother that he would reach his goal and move AH to the United States "[i]n the healthiest permanent way."

While the two may have planned their future together, their relationship was also marred by volatility and, at times, physical violence. Hundur and Barut often got into arguments in which they raised their voices and used profanity towards one another. And Hundur admitted to pushing Barut more than once and grabbing her by the wrists on several occasions. For instance, in August 2023, shortly after AH was born, Hundur was holding AH when the two began to argue. Hundur yelled at Barut, called her "useless," and grabbed her wrists and twisted them.

Barut also testified to other episodes of violence. She stated that, in April 2024, the two got into a fight, and Hundur hit her with a rolled T-shirt and grabbed her around the neck while AH was in the apartment, close by. In support of her testimony, Barut submitted pictures showing faint redness on her back, arm, and neck. Barut testified that, in May 2024, Hundur yelled expletives at her, pushed her towards a wall, and began choking her, while AH was crawling in the room. She further testified that, on various occasions, Hundur forced her into having sex.[1] Hundur, however, denied each of these allegations and, apart from the photographs, Barut was not able to provide any corroborating evidence. The Court thus declines to fully credit Barut's allegations.[2]

Despite the volatility of their relationship, Barut and Hundur decided to marry. Barut felt that they were working on their relationship and wanted to give AH stability. She also believed that getting married would facilitate obtaining a visa to come to the United States. And so the two married on July 12, 2024, and planned a trip to the U.S. for that fall.

---

[1] In addition, Barut testified that she frequently observed Hundur kissing AH's genital area while changing his diaper, implying that Hundur engaged in inappropriate sexual behavior with AH. The Court deems this testimony not credible. During the evidentiary hearing, Hundur explained that he kisses his son while changing his diaper but credibly testified that he has never kissed his son's genitals or touched him inappropriately.

[2] Barut also testified that Hundur has an aunt who is a member of the Turkish senate. She claimed that he threatened that if she ever left him, he would use his aunt's power to put her in jail, have her tortured, or block her from working. Barut's description of these threats was vague and not fully credible, particularly as she admitted that she had never met the family member in question.

In August 2024, shortly after their marriage, Hundur and Barut had an argument that led them to temporarily separate. During the argument, Hundur began to yell and threw glass objects on the floor, causing Barut to cut her foot on broken glass. AH was in the room at the time, and began to cry. After the argument, Hundur left their apartment for roughly one week.

While the two were separated, Hundur texted Barut canceling the trip to the U.S. and stating that he wanted a divorce. Over the next week, Barut tried to negotiate with him to be able to go to the U.S. with AH. Hundur responded by telling Barut that she could travel to the U.S., but that AH would "not be going anywhere." Barut, however, explained that she missed her mother and her family, who had recently moved near Atlanta, Georgia. She promised that she and AH would be gone for "just a 15-day holiday" to visit family and "then come back."

Barut and Hundur reconciled a few days later, and Hundur agreed to let Barut and AH travel. He purchased one-way plane tickets for Barut and AH from Istanbul to Atlanta and signed a consent form authorizing AH to travel to the U.S. and return back to Turkey with Barut. Hundur also purchased two months of temporary travel insurance for AH. Prior to leaving, Barut did not pack up their apartment in Istanbul and did not rent an apartment in Georgia.

Barut testified at the evidentiary hearing that she believed that the couple had agreed to permanently move to the U.S. She stated that Hundur planned to join them in the U.S. later that month, at which point they would spend a couple of months in different states before deciding where to live. But her testimony was uncorroborated by contemporaneous evidence. Hundur, for his part, maintains that he believed Barut was taking AH on a trip to visit her family for no more than a few months. His testimony is supported by text messages he sent to a friend days before Barut and AH left stating that Barut and AH were traveling for "at least one month" but he believed they might extend the trip for longer—perhaps "three months or so."

4

On September 1, 2024, Barut and AH few from Istanbul to Atlanta. They entered the U.S. on tourist visas and stayed with her mother and brother outside of Atlanta.

Towards the end of September, Hundur had a sudden brain aneurysm. The aneurysm left him hospitalized for twenty-five days and he could not travel for the following four months. In October 2024, as he was recovering, Hundur asked Barut when she and AH were returning to Turkey. Barut told Hundur that she and AH would not be returning, that she was "setting up [her] life in the USA," and that she wanted a divorce. On November 4, 2024, Hundur submitted a Hague Convention application for the return of a minor child to the Turkish Ministry of Justice. Then in December 2024, Barut filed an application for asylum.

Once Hundur was cleared to travel, he made a series of trips to visit Barut and AH. In January 2025, Hundur visited AH in Georgia for approximately one week. In February 2025, Hundur went again to visit AH while Barut was out of town. After his trip, Hundur insisted that AH should come back to Turkey, but Barut refused. In April 2025, Hundur returned to visit and spent approximately one week with Barut and AH. During each of his trips, Hundur spent time alone with AH. Hundur also paid for household expenses and expenses related to AH's care.

Hundur made a final trip in late May 2025. During his trip, he and Barut were on good terms. They began functioning as coparents, enrolled AH in daycare and a swimming school, and took him to a pediatrician. The two also became romantic again and discussed having another child. Around the same time, Hundur registered a limited liability company in Georgia and made inquiries about applying for permanent residency for AH through his business. He discussed with Barut the possibility of him moving to the U.S. in January 2026, but those plans never materialized, due in part to shifting economic conditions and increased tariffs that severely harmed Hundur's business.

In June 2025, after Hundur had returned to Turkey, AH got sick with pink eye and an ear infection and Barut was forced to take him to the emergency room. Following AH's visit to the emergency room, the parties' relationship deteriorated. Hundur was upset and concerned that AH was not receiving proper medical care in the United States. A few weeks later, he filed for divorce in Turkey. Barut then sought and received a protective order against Hundur, alleging that she had been "subjected to insults, curses, psychological and economic violence." Hundur filed his Hague Petition in federal district court for the Northern District of Georgia in July 2025.[3]

In addition to her testimony during the evidentiary hearing, Barut offered testimony from her mother and Pamela Krasner, a licensed social worker. Barut's mother testified that, during Barut's relationship with Hundur, she "lost her self-confidence." Krasner, for her part, submitted a report based on an interview with Barut in which she opined that Barut experienced symptoms of Post-Traumatic Stress Disorder ("PTSD") while living with Hundur. Krasner also opined that, based on Barut's description of her relationship with Hundur, AH had been exposed to trauma that could lead him to develop PTSD and shorten his life expectancy.[4]

## II.    LEGAL STANDARD

The Hague Convention, ratified by Congress through ICARA, "sets forth a detailed framework for addressing claims of international child abduction during domestic disputes

---

[3] After a show cause hearing, the court determined that it lacked jurisdiction over the Petition as Barut and AH had since moved to Virginia. The court thus transferred the case to this Court in September 2025. ECF 31.

[4] After the evidentiary hearing in this matter, Hundur submitted a Motion to File Post Hearing Exhibits Under Seal, in which he sought to present additional evidence to the Court not adduced during the hearing. ECF 110. Barut moved to strike this additional evidence and preclude the Court from considering extra-record information in Hundur's Proposed Findings of Fact and Conclusions of Law. ECF 114. The Court will grant Barut's Motion to Strike (ECF 114) and deny Hundur's Motion to File Post Hearing Exhibits (ECF 110). The Court extended Hundur ample opportunity during the evidentiary hearing to seek to admit all of the evidence he wished the Court to consider. Hundur has shown no good cause as to why he did not seek to admit this evidence during the evidentiary hearing. In addition, allowing Hundur to present additional evidence now, without opportunity for cross examination or objections as to the evidence's admissibility would severely prejudice Barut.

between parties in signatory nations." *Padilla v. Troxel*, 850 F.3d 168, 175 (4th Cir. 2017). The "core premise" of the Convention is that children's interests in custody matters are "best served when custody decisions are made in the child's country of habitual residence." *Golan v. Saada*, 596 U.S. 666, 670 (2022) (internal quotation marks omitted). The Convention aims not to settle international custody disputes, "but rather to ensure that cases are heard in the proper court." *Baxter v. Baxter*, 423 F.3d 363, 367 (3d Cir. 2005). The Convention thus "generally requires the 'prompt return' of a child to the child's country of habitual residence when the child has been wrongfully removed to or retained in another country." *Golan*, 596 U.S. at 670 (quoting Art. 1(a), Treaty Doc., at 7).

To establish that a child was wrongfully removed—and secure his return under the Convention—a petitioner must demonstrate that "(1) the child was 'habitually resident' in the petitioner's country of residence at the time of removal, (2) the removal was in breach of the petitioner's custody rights under the law of his home state, and (3) the petitioner had been exercising those rights at the time of removal." *Bader v. Kramer*, 484 F.3d 666, 668 (4th Cir. 2007) (quoting *Humphrey v. Humphrey*, 434 F.3d 243, 246 (4th Cir. 2006)).

If a petitioner demonstrates wrongful removal, the court must order the child's return unless the respondent can establish one of four defenses: (1) return would expose the child to a grave risk of physical or psychological harm or otherwise place the child in an intolerable situation; (2) return of the child would not be permitted by fundamental principles of the United States relating to the protection of human rights and fundamental freedoms; (3) the petition for return was not filed within one year of the removal and the child is now well-settled in another country; or (4) the petitioner was not exercising his custodial rights at the time of the removal or had consented to or acquiesced in the removal. *Bader*, 484 F.3d at 668-69. A respondent must prove

7

the first two defenses by clear and convincing evidence while the latter two require a preponderance of the evidence. *Id.*

## III.    ANALYSIS

Barut concedes that she wrongfully removed AH from Turkey under the Convention and the Court agrees. There is no dispute that AH was a habitual resident of Turkey prior to his removal, that Hundur had joint custody over AH, and that he was exercising his custodial rights.

The question thus becomes whether Barut has established a defense to the Petition that would preclude AH's return. Barut asserts two defenses: that returning AH to Turkey would expose him to a grave risk of harm and that Hundur consented or acquiesced to AH's removal. The Court considers each of her defenses in turn.

### A.    Grave Risk of Harm

Barut first contends that she suffered violence, psychological abuse, and sexual abuse at the hands of Hundur that will expose AH to a grave risk of harm if he were to be returned to Turkey. While the Court strongly condemns spousal violence and sexual assault, it concludes that Barut has not met her burden to show that AH will face grave danger if he returns to Turkey.

Under Article 13(b) of the Hague Convention, the Court "is not bound to order the return of the child" if the respondent can establish by clear and convincing evidence that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b); 22 U.S.C. § 9003(e)(2)(A). Courts have cautioned that this exception should "be interpreted narrowly." *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007). To satisfy the exception, the potential risk to a child must be "grave" or "intolerable," rather than "merely serious." *Id.* at 604-05 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996)); *see also, e.g.*, *Ermini v. Vittori*, 758

8

F.3d 153, 164 (2d Cir. 2014) (explaining that a "grave risk of harm exists when repatriation would make the child face a real risk of being hurt, physically or psychologically" (cleaned up)). The defense therefore serves to protect children from being "exposed to physical or psychological danger." *Luis Ischiu v. Gomez Garcia*, 274 F. Supp. 3d 339, 350 (D. Md. 2017) (quoting *Simcox*, 511 F.3d at 604).

Spousal violence, in certain circumstances, can "establish a grave risk of harm to the child, particularly when it occurs in the presence of the child." *Ermini*, 758 F.3d at 164. To present a grave risk, the spousal violence or abuse must be more than "[s]poradic or isolated." *Id.* at 165 (quoting *Souratgar v. Lee*, 720 F.3d 96, 104 (2d Cir. 2013)). For instance, in *Ermini*, the Second Circuit determined that the respondent established a grave risk of harm where the evidence showed that the petitioner was "in the habit of striking the children," had hit the respondent at least ten times, and had shoved her head into kitchen cabinets while attempting to strangle her. 758 F.3d at 165. Likewise, in *Baran v. Beaty*, 526 F.3d 1340 (11th Cir. 2008), the Eleventh Circuit affirmed the denial of a Hague Petition where the petitioner had beaten the respondent multiple times, including while she was pregnant; abused the respondent in the child's presence after he was born, including by swinging a telephone at her head while threatening her life; and undressed the child in front of the petitioner's friends and carried him with one hand while drunk. *Id.* at 1342-43, 1346. And in *Luis Ischiu*, the court concluded that the child's return would place him in grave danger where the respondent was sexually assaulted multiple times by the petitioner's father and brother, the petitioner threatened her not to report the abuse, the petitioner repeatedly used physical violence against her, and, when she became suicidal, took no action to help her obtain mental health treatment. 274 F. Supp. 3d at 343, 350-51.

9

By contrast, in *Simcox*, the Sixth Circuit observed that it was a "close question" as to whether domestic and spousal violence presented a grave risk of harm even where the petitioner frequently spanked, hit, and whipped the children with a belt, hit the respondent on "numerous occasions," and, in one instance, hit one of the children when the child attempted to intervene in spousal violence. 511 F.3d at 599, 608-09. And courts have declined to find a grave risk of harm where, for example, a petitioner verbally abused the respondent, shoved her, and threw a rock at her car but did not engage in any physical or psychological abuse of the child, *Whallon v. Lynn*, 230 F.3d 450, 453, 460 (1st Cir. 2000), or where there was some evidence that the petitioner had kicked and put his hands on the petitioner's throat but had never harmed the child, *Belay v. Getachew*, 272 F. Supp. 2d 553, 556, 560 (D. Md. 2003). In both instances, courts concluded that the evidence did not show a clear history of spousal abuse that rose to the level of presenting a grave risk of future harm to the child's wellbeing. *See Whallon*, 230 F.3d at 460; *Belay*, 272 F. Supp. 2d at 560.

Here, Barut has not presented clear and convincing evidence that returning AH to Turkey would subject him to a grave risk of harm. First, the Court notes that there are no credible allegations that AH himself has been subjected to violence or abuse, nor is there any clear evidence that AH has been psychologically harmed. Krasner's expert report did opine that AH has experienced major life trauma and would be at risk of harm if he returned to Turkey. ECF 56 at 13-15. Her findings, however, are based in large part on evidence that was not introduced at the evidentiary hearing or is irrelevant to the Court's analysis. *See id.* at 14 (noting that Hundur has "mental health issues," issues with drug use, and would insult AH, findings that are unsupported by the present record).

Second, while the Court recognizes that witnessing spousal abuse can inflict psychological damage on a child, *see Luis Ischiu*, 274 F. Supp. 3d at 351, Barut has not presented credible allegations of the kind of repeated abuse that courts have concluded can create a grave risk for children. In sum, Barut has presented evidence that Hundur sexually assaulted her prior to AH's birth, grabbed her wrists after AH's birth, hit her with a rolled t-shirt, and threw glass on the ground. The Court does not condone any of Hundur's actions. But the incidents of violence fall short of the clear history of abuse present in *Ermini*, *Baran*, and *Luis Ischiu* and are more akin to the isolated incidents which courts found insufficient in *Whallon* and *Belay.*

Perhaps most significantly, there is no indication that the abuse will continue in the future. Barut and Hundur are in the process of getting divorced. And the evidence indicates that any threat to AH's wellbeing is largely eliminated when the two are not attempting to co-parent as a couple. During the first half of 2025, Hundur spent extended time in the United States with AH, including time alone, with no reported issues. He appears to have a healthy and loving relationship with AH, and even Barut has admitted that she has "supported" their relationship.

Weighing this evidence together, that Court concludes that Barut has failed to establish a "grave risk" defense by clear and convincing evidence.

### B.      Consent and Acquiescence

Barut next argues that AH should not be returned to Turkey because Hundur both consented to AH's removal and acquiesced to him remaining in the United States.

Consent and acquiescence are two distinct affirmative defenses. "Whereas the consent defense concerns the petitioner's conduct before the contested removal or retention, the acquiescence defense concerns whether the petitioner subsequently agreed to or accepted the removal or retention." *Padilla*, 850 F.3d at 175. Examining the evidence, the Court concludes that

11

Barut has established neither Hundur's consent nor his acquiescence to AH's removal by a preponderance of the evidence.

### 1. Consent

The consent defense evaluates whether a petitioner agreed to or contested a child's removal or retention from their home country. *Baxter*, 423 F.3d at 371. To assess consent, courts primarily look to "the parties' conduct *prior* to" a child's removal. *Padilla*, 850 F.3d at 176. Nevertheless, "a petitioner's conduct *after* removal can further inform whether [he] consented at the time of removal." *Id.* Ultimately, the inquiry is fact-intensive and hinges on a petitioner's subjective intent; courts must consider "what the petitioner actually contemplated and agreed to in allowing the child to travel outside [his] home country." *Baxter*, 423 F.3d at 371. The fact that a petitioner initially allows children to travel, knows their location, and how to contact them "does not . . . constitute consent to removal or retention under the Convention," absent some indication that the petitioner approved of the child's permanent relocation. *Id.*; *see also id.* at 372 (concluding that petitioner did not consent to a child's removal where he agreed to allow the child to visit his grandmother's house in the U.S. for a few months, but did not establish a firm plan to permanently move); *see also, e.g.*, *Panteleris v. Panteleris*, 30 F. Supp. 3d 674, 686-87 (N.D. Ohio 2014) (ruling that respondent failed to establish petitioner's consent where the evidence indicated that petitioner agreed to allow the children to live in the U.S. for one year but not to permanently relocate).

Although there is plenty of evidence that the parties hoped to move to the United States, the record does not support Barut's contention that Hundur consented to her permanently moving to the U.S. with AH in September 2025. In negotiating for Hundur's permission to travel with AH, Barut promised that the trip would be a temporary visit to see her mother and family, stating that she would "go away for a while and then come back" for "just a 15-day holiday." Hundur explicitly

12

expressed his concern that, if he gave her permission, she would not come back, but Barut dismissed these concerns, stating "what's your problem?" When Hundur later agreed and gave Barut written permission to travel, her travel plans were not indicative of a planned family move overseas. Hundur purchased Barut and AH one-way tickets to the U.S., but AH and Barut traveled on tourist visas, Barut did not rent an apartment, and she did not pack up her things in Istanbul. Shortly before Barut and AH left, Hundur texted a friend to explain that Barut and AH were traveling for a month or maybe three. None of this evidence indicates that Hundur knew Barut planned to move to the U.S. or that he agreed to such a plan.

Barut points out that, after she and AH arrived in the U.S., Hundur did not inquire about their return plans for several weeks. But this delay is not extraordinary, given that Hundur appears to have authorized a trip of at least one month. Moreover, any delay in seeking AH's return was also likely due in part to Hundur's hospitalization in late September 2025 following a brain aneurysm. As he recovered in the hospital, Hundur asked when AH would be returning to Turkey. When Barut told him that she and AH would not be returning, he submitted a Hague Convention application through the Turkish Ministry of Justice on November 4, 2024, seeking AH's return. Taken together, Barut's representations about the length of her travel, the nature of her travel preparations, and Hundur's questions shortly after Barut left about when she would return indicate that Hundur agreed to allow AH to visit Barut's family for a few months but did not agree to AH permanently moving abroad.[5] "This intent falls short of the standard for finding consent under article 13(a) of the Convention." *Baxter*, 423 F.3d at 372.

---

[5] Barut argues that her case is similar to *Delgado v. Osuna*, No. 4:15-cv-00360-CAN, 2015 WL 5095231, *10-11 (E.D. Tex. Aug. 28, 2015), and *Pflucker v. Warms*, No. No. 8:21-cv-1869-WFJ-JSS, 2021 WL 4593824, at *10 (M.D. Fla. Oct. 6, 2021), in which courts concluded that a respondent had established consent to their children's removal. But in *Delgado*, both parents traveled together to the United States with all of their important documents and jewelry, they both consistently testified that there was no planned end date to their stay, the petitioner helped the respondent apply for asylum in the United States for the children, and testified that he intended for them to remain in the United States for at least one year. 2015 WL 5095231, at *3, 10-11. In *Pflucker*, the Petitioner similarly traveled to the U.S.

### 2. Acquiescence

Barut's final defense is that Hundur acquiesced to AH's removal from Turkey. An acquiescence defense considers whether a petitioner subsequently agreed to or accepted a child's removal from their home country. *Baxter*, 423 F.3d at 371. The defense turns on a petitioner's subjective intent after the child's removal. *Darin v. Olivero-Huffman*, 746 F.3d 1, 16 (1st Cir. 2014). A showing of acquiescence also differs from a consent defense in that it requires more formal evidence. *Padilla*, 850 F.3d at 176. To determine acquiescence, courts look to "evidence such as testimony in a judicial proceeding, a convincing renunciation of rights, or a consistent attitude over a significant period of time." *Id.*; *see also Darin*, 746 F.3d at 16.

Barut contends that Hundur's "consistent attitude" during the first six months of 2025 demonstrate that he acquiesced to AH remaining in the United States. ECF 105 at 25-26. In support, she points to Hundur's visits to see AH; his financial support for AH during those visits; his efforts in May 2025 to enroll AH in daycare, swim school, and occupational therapy; his inquiries into obtaining permanent residency in the U.S. for AH and himself; the business he established in Georgia; and voice messages he sent to Barut contemplating a future in the United States. Barut argues that the cumulative evidence makes this case analogous to *Ambrioso v. Ledesma*, 227 F. Supp. 3d 1174, 1190 (D. Nev. 2017), where the court concluded that a petitioner had acquiesced to a child's removal given that, after the respondent took the child to Nevada, the petitioner reestablished contact with the respondent, commented that it would be better for the child to grow up in the U.S., contacted a realtor to look for a home, sent gifts and financial support, and sent his brother to establish a business in the area.

---

with the respondent, enrolled the children in school, leased an apartment, and worked with immigration attorneys to compile documents for a permanent residency application. *Id.* at *10. No similarly strong evidence of consent exists here.

14

The full evidentiary picture, however, does not show the clear evidence of acquiescence present in *Ambrioso*. To be sure, Hundur visited AH multiple times in Georgia and provided financial support during those visits. "But a petitioning parent's efforts to remain involved in his child's life do not usually amount to acquiescence." *Schwaneberg v. Lopez*, No. 4:24-cv-00039, 2024 WL 5010144, at *21 (W.D. Va. Dec. 6, 2024) (concluding that the petitioner had not acquiesced to the child's removal despite paying for the child's daycare expenses and keeping in regular touch with the child); *see also Darin*, 746 F.3d at 19 (holding that petitioner's care packages and regular communications with his son and son's school showed "nothing more" than his "intention to be involved in his child's life").

Moreover, as Hundur visited AH, he continued to press for AH's return. For example, after Hundur's visit in February 2025, he demanded that AH "come to Turkey now" so that AH could "have a life with [him], too." When Barut refused to return AH, Hundur kept visiting him, became more involved with AH's life in Georgia, and explored the possibility of moving to Georgia to be with AH there. He went so far as to open a business in Georgia and look into permanent residency for AH. But, when viewed in context, these actions were more akin to an attempt to work with Barut towards some resolution of the situation, rather than an unequivocal acquiescence to AH living in the U.S., with or without him. *See Bocquet v. Ouzid*, 225 F. Supp. 2d 1337, 1350 (S.D. Fla. 2002) (concluding that the petitioner's efforts to visit her child and work out a custody arrangement did not demonstrate a consistent attitude of acquiescence to the child's removal). When it became clear two months later that Hundur's plan to move to the U.S. to be with AH and Barut may not work out, he filed his Hague Petition seeking AH's return.

As a whole, Hundur's sporadic efforts to obtain AH's return to Turkey or find a way to join him in the U.S. make this case far closer to the conditional consent at issue in *Baxter* and

15

*Moura v. Cunha*, 67 F. Supp. 3d 493, 507 (D. Mass. 2014). In both instances, the courts concluded that petitioner consented to a child moving abroad only if the petitioner was able to join them. *See Baxter*, 423 F.3d at 372; *Moura*, 67 F. Supp. 3d at 507. But that circumscribed consent did not extend to the permanent removal of a child *without* the petitioner. *Baxter*, 423 F.3d at 372; *Moura*, 67 F. Supp. 3d at 507. So too here. Hundur may have been willing to allow AH to stay in the U.S. if he too had been able to move here and join them. But his efforts to reunite with AH after AH's removal do not show consistent agreement over time to permanently turning control over to Barut or allowing AH to stay in the U.S. in his absence. Barut therefore has not shown Hundur's acquiescence to AH's removal.

\* \* \*

In sum, the Court concludes that AH was wrongfully removed from Turkey, and that Respondent has not demonstrated that an exception to the Hague Convention applies. The Court's conclusion has no bearing on the ultimate custody dispute over AH, nor does the Court determine where his best interests lie. Rather, the Court simply determines that, under the Hague Convention, it is Turkish Courts, not American ones, that must sort those questions out.

## IV.    CONCLUSION

For the foregoing reasons, the Court grants the Petition pursuant to the Hague Convention and ICARA and will order AH's prompt return to Turkey through an order to accompany this memorandum opinion.

**SO ORDERED.**

/s/
_____
Michael S. Nachmanoff
United States District Judge

April 14, 2026
Alexandria, Virginia

16